Approved: ______________________________
NICHOLAS W. CHIUCHIOLO / TIMOTHY V. CAPOZZI
Assistant United States Attorneys

Before: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

20 MAG 5276

UNITED STATES OF AMERICA

- v. -

RONALD ROMANO,

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 371, 1343, 1349, and 2

COUNTY OF OFFENSE: NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

DELEASSA PENLAND, being duly sworn, deposes and says that she is a Special Agent with the United States Attorney's Office for the Southern District of New York (the "USAO"), and charges as follows:

**COUNT ONE**
(Wire Fraud Conspiracy)

1. From at least in or about February 2020, up to and including in or about April 2020, in the Southern District of New York and elsewhere, RONALD ROMANO, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and object of the conspiracy that RONALD ROMANO, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, which scheme

involved the use of interstate wires, including emails telephone calls, and text messages transmitted into the Southern District of New York.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**

(Wire Fraud)

3. From at least in or about February 2020, up to and including in or about April 2020, in the Southern District of New York and elsewhere, RONALD ROMANO, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ROMANO, and others known and unknown, participated in a scheme to attempt to price gouge the City of New York ("NYC"), and other victims, during the novel coronavirus/COVID-19 pandemic by making false and fraudulent statements seeking to induce NYC to pay more than $45 million for what ROMANO represented to be 3M-brand N95 respirators, representing a more than 400% markup of the list price for such respirators, which scheme deprived victims of the ability to make informed decisions and exposed those victims to economic risk and involved the use of interstate wires, including emails, telephone calls, and text messages transmitted into and out of the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT THREE**

(Conspiracy to Violate the Defense Production Act)

4. From at least on or about March 25, 2020, up to and including at least in or about April 2020, in the Southern District of New York and elsewhere, RONALD ROMANO, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, hoarding of designated scarce materials, in violation of Title 50, United States Code, Section 4512.

5. It was a part and object of the conspiracy that RONALD ROMANO, the defendant, and others known and unknown, willfully and

knowingly would and did accumulate, for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation, to wit, certain respirators and facemasks, in violation of Title 50, United States Code, Section 4512.

Overt Acts

6. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about March 31, 2020, ROMANO caused to be transmitted to NYC false and misleading references for the purpose of causing NYC to purchase approximately seven million face respirators at more than a 400% markup from the 3M list price.

b. On or about March 29, 2020, ROMANO caused to be transmitted to the Florida Division of Emergency Management (the "FDEM") a formal quote for N99 facemasks at an approximately 500% markup.

(Title 18, United States Code, Section 371.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

7. I am a Special Agent with the United States Attorney's Office for the Southern District of New York, and I have been personally involved in the investigation of this matter which has been conducted by the Special Agents of the USAO and Special Investigators with the New York City Department of Investigations. I have been a Special Agent with the USAO for approximately five years. In that capacity, I primarily investigate complex fraud schemes and public corruption.

8. This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they

are reported in substance and in part, except where specifically indicated otherwise.

**OVERVIEW OF THE SCHEME**

9. The charges in this Complaint arise from a multi-faceted fraud scheme by RONALD ROMANO, the defendant, and others to price gouge victims, including NYC, exploiting the victims' critical need to obtain legitimate, potentially lifesaving personal protective equipment ("PPE"), such as respirators (colloquially referred to as facemasks), as quickly as possible in order to supply frontline healthcare workers and first responders during the COVID-19 public health emergency. As part of their scheme, ROMANO and others repeatedly made false and fraudulent representations regarding, among other things, their authority and ability to supply the promised PPE, and their track record in other PPE deals. These misrepresentations were intended to and in fact did cause their victims falsely to believe that they were negotiating with legitimate PPE suppliers when that was not true, thus depriving their victims of the ability to make informed decisions during a global pandemic and exposing the victims to tremendous risk. As set forth below, the defendant's fraudulent scheme included, among other things, a brazen and fraudulent attempt to convince, via a series of misrepresentations, NYC to pay the scheme's participants more than $45 million for a promised delivery of seven million 3M-brand N95 respirators, representing a more than 400% markup from the 3M list price and the price at which ROMANO and others attempted to acquire the respirators for resale, during late March and early April of this year, when NYC was at its most vulnerable. In addition, ROMANO and others attempted to sell non-3M brand facemasks at prices marked up between approximately 250% and 1,100% from the manufacturer's sales prices.

**RELEVANT INDIVIDUALS AND ENTITIES**

10. RONALD ROMANO, the defendant, resides in Manalapan, New Jersey, and operates a used car dealership (the "Car Dealership") in the same town. As alleged in greater detail below, ROMANO is also the President of another New Jersey-based company ("Vendor-1") that he and others used in furtherance of the fraud scheme. Other than as alleged herein, ROMANO does not appear to have experience selling PPE or medical equipment.

11. Co-Conspirator-1 ("CC-1") is a business associate of RONALD ROMANO, the defendant, in ROMANO's Car Dealership, and the purported Vice President of Global Sales for Vendor-1. Other than

as alleged herein, CC-1 does not appear to have experience selling PPE or medical equipment.

12. Co-Conspirator-2 ("CC-2") has interests in various business entities, including a company that manufactures heating products ("CC-2 Company-1") with locations in New Jersey and Ireland. Based on my participation in this investigation, including my review of email correspondence obtained pursuant to judicially authorized warrants, I am aware that CC-2 was a friend and business associate of RONALD ROMANO, the defendant, and claimed to have sources of supply of certain PPE, including N95 and N99 respirators.

13. Co-Conspirator-3 ("CC-3") is a former Minister of Foreign Investment of a European nation. CC-3 purported to have expertise in transnational business transactions and, as set forth in greater detail below, attempted to broker sales of respirators and facemasks. At all relevant times, CC-3 resided in New York, New York.

14. "Broker-1" is the co-founder and Chief Executive Officer of a Pennsylvania-based packaging company (the "Packaging Company") and, as alleged in greater detail herein, attempted to broker sales of respirators and facemasks. At all relevant times, Broker-1 resided in Philadelphia, Pennsylvania.

15. "Broker-2" is the co-founder and Chief Operating Officer of the Packaging Company, is married to Broker-1, and, as alleged in greater detail herein, attempted to broker sales of respirators and facemasks. At all relevant times, Broker-2 resided in Philadelphia, Pennsylvania.

16. "Broker-3" is an attorney and broker who purports to have expertise in, among other things, raising capital for health care companies and hedge funds. As alleged in greater detail herein, Broker-3 attempted to broker sales of PPE facemasks. At all relevant times, Broker-3 resided in the vicinity of Miami, Florida.

17. The 3M Company ("3M") is a manufacturer and provider of, among other things, PPE for healthcare professionals, industry workers, and the public. 3M is headquartered in St. Paul, Minnesota.

18. Vendor-1 is a limited liability company organized under the laws of New Jersey, with its registered place of business in Manalapan, New Jersey, at an address where RONALD ROMANO, the

defendant, is known to reside. ROMANO created Vendor-1 in or about 2012 and listed himself as the company's President. While the original business purpose of Vendor-1 is unclear, it appears to have no record of selling PPE prior to the COVID-19 pandemic. Based on my review of bank records, government records, and public source materials, it appears that Vendor-1 was mostly inactive until ROMANO and his co-conspirators commenced the fraud scheme alleged herein, in or about February 2020. Indeed, Vendor-1 had no legal status when the fraud scheme started. On or about February 11, 2020, the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, sent a letter to ROMANO stating, in part, that Vendor-1 was in "revoked status" because the company had failed to comply with the state's reporting requirements. Based on my review of Vendor-1's bank records, I am aware that on or about March 17, 2020, Vendor-1 paid $500 to reinstate Vendor-1's legal status with the State of New Jersey. Vendor-1 appears to have no website or social media presence.[1]

**THE GLOBAL COVID-19 PANDEMIC**

19. Based on my experience and my knowledge derived from this investigation and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. Towards the end of 2019, there was public reporting of a novel coronavirus, within the Wuhan Province of the People's Republic of China, causing the coronavirus disease 2019 ("COVID-19"). Individuals with COVID-19 can have a wide array of symptoms, including: cough, shortness of breath, fever, chills, muscle pain, sore throat, and/or loss of taste or smell. In some cases, complications from COVID-19 may cause death. As of May 20, 2020, there have been approximately 323,256 deaths worldwide publicly attributed to COVID-19.

b. According to the Centers for Disease Control (the "CDC"), the virus that causes COVID-19 is believed to spread through respiratory droplets produced when an infected person coughs or sneezes. The virus can be transmitted if these droplets land in the mouths or noses of nearby people. Accordingly, the CDC has issued guidance recommending the use of face coverings to

[1] During the COVID-19 pandemic and the fraud scheme alleged herein, ROMANO planned to create a website for Vendor-1. On or about March 13, 2020, ROMANO sent a text message to CC-2 that stated, "I'm going to build a website. I'm told the second spike of virus will be in October may be even bigger."

prevent the spread of the virus. Likewise, on or about April 15, 2020, New York Governor Andrew M. Cuomo issued an executive order requiring all people in New York to wear face coverings in public.

c. While the novel coronavirus was first detected in China, the virus quickly spread across the globe. By March 2020, NYC became the epicenter of COVID-19 within the United States, having far more positive cases and deaths than any other state or region in the United States.

d. The rapid spread of COVID-19 across the country and the New York metropolitan area threatened to overwhelm the provision of healthcare services in the Nation generally and New York specifically. To that end, federal and state officials in New York and metropolitan area hospitals took extraordinary steps to meet the critical need to treat those infected, including the creation of makeshift hospitals.

## **THE DEFENSE PRODUCTION ACT**

20. To address the national emergency caused by the spread of the novel coronavirus, on or about March 18, 2020, the President of the United States issued Executive Order 13909, which invoked the powers of the Defense Production Act of 1950, 50 U.S.C. §§ 4501 et seq. (the "Act"). Among other things, the Act authorizes the President to "allocate materials . . . in such a manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense. *Id*. at 4511(a)(2). Under the Act, the President may control the "general distribution of any material in the civilian market" upon a finding: "(1) that such material is scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." *Id*. at 4511(b).

21. To prevent the hoarding of scarce and critical materials during a national crisis, the Act provides that "no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation." *Id*. at 4512.

22. The President delegated authority to the Secretary of Health and Human Services ("HHS") to identify specific health and medical resources that meet the criteria under the Act. On March 25, 2020, HHS exercised such authority and published a notice, *see* 85 Fed. Reg. 17592, designating the following health and medical resources, among others, under the Act as scarce materials or materials the supply of which would be threatened by the accumulation in excess of reasonable demands for the purpose of resale at prices in excess of prevailing market prices: (i) N95 filtering facepiece respirators; (ii) other filtering facepiece respirators (*e.g.*, those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory protective devices that cover the user's airway (nose and mouth); (iii) PPE facemasks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels; (iv) PPE surgical masks; and (v) PPE face shields.

**THE DEMAND FOR N95 RESPIRATORS**

23. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. Due to the combination of the highly transmissible nature of the novel coronavirus and the unprecedented demand for emergency medical services to treat patients presenting with COVID-19 symptoms, hospitals and medical professionals have experienced critical shortages of PPE, such as one-time usage facemasks. PPE is necessary to protect medical professionals and first responders who are on the frontline battling the global COVID-19 pandemic. In particular, N95 respirators can prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose.

b. By March 2020, it was widely reported that healthcare providers and first responders, including police departments and fire departments, faced critical shortages of PPE, including face respirators. Because of New York's critical shortage of certain PPE and the exponential demand, Governor Andrew M. Cuomo signed an executive order authorizing the New York National Guard to seize unused PPE from private health care organizations and place them in hospitals that need them the most in NYC.

c. Based on my review of public source material and my participation in witness interviews, I am aware that 3M-brand N95 respirators were generally (and remain) a sought after brand of respirators by healthcare providers and state and local governments. 3M's N95-rated filtering respirators have a filtration efficiency of at least 95% against non-oily particles.

d. Notwithstanding this surging demand, 3M has not increased the prices that it charges for 3M-brand N95 respirators. 3M's per-respirator suggested retail price, *i.e.*, list price, for 3M-brand models 1860 and 8210 respirators are $1.27 and $1.02-$1.31, respectively.

e. 3M sells its safety products through authorized distributors. 3M controls the distribution of its safety products to ensure that its authorized distributors adhere to strict quality-control standards, given that consumers rely on the efficacy of 3M's products for their health and safety. Thus, 3M vets its potential authorized distributors and controls the distribution of its products through authorized distribution agreements. 3M does not authorize third parties to manufacture its products, and authorized distributors must acquire 3M products directly from 3M.

f. At all times relevant to the allegations contained herein, neither RONALD ROMANO, the defendant, nor his company, Vendor-1, was authorized to sell or solicit orders for 3M products, including 3M-brand N95 respirators.

## THE FRAUD SCHEME

### ROMANO, CC-1, and CC-2 Enter PPE Market

24. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. Beginning in or about February 2020, RONALD ROMANO, the defendant, and others, including his business associate, CC-1, and his friend and business associate, CC-2, commenced efforts to obtain for resale large quantities of PPE, including N95 respirators. As described below, the potential sources of PPE

included a Mexico-based company, a "hedge fund" associated with CC-2, a Peruvian-based exporter, and 3M itself.

b. ROMANO and CC-2 discussed, in substance and in part, that they could get rich quick by closing a sale of respirators. On March 9, 2020, ROMANO sent a text message to CC-2, stating in part, "I'm working on a few deals that if I get any of them you might be buying a Ferrari."

**The Purported Mexico-Sourced Respirators**

c. Starting in or about February 2020, ROMANO's friend and business associate, CC-2, began negotiating with a Mexico-based company to purchase, for purposes of resale, face coverings and other PPE, and ROMANO and CC-2 had an ongoing dialogue about obtaining PPE from various sources. In turn, ROMANO, among others, attempted to sell the PPE sourced by CC-2. To that end, in or about March 2020, ROMANO contacted CC-3, whom ROMANO met a few years prior, and asked CC-3 to sell face respirators sourced by ROMANO. ROMANO and CC-3 agreed that CC-3 would receive a 25-cent commission per mask sold through CC-3's efforts.

d. On or about March 2, 2020, ROMANO emailed CC-3, "here are the specs for the mask[s] we have available." ROMANO listed prices ranging from $4.01 to $4.11 per respirator. Later that day, CC-3 responded to ROMANO's email, stating in part, "WOW!! I just saw the prices. They are outrageous on a per mask basis. The N95 mask I sent you in the last e-mail with a valve is only $1.95 per mask. And you want to charge over $4?" Shortly after sending this email, CC-3 sent ROMANO another email expressing astonishment over the pricing: "Look, I really have a problem with the pricing. It's one thing to charge (as [CC-1] told me last night) 25-30% more than the usual price -- but here you are charging around 260%. . . . I feel like the prices you have sent me are taking advantage of people." Nonetheless, CC-3 attempted to sell these respirators on ROMANO's behalf.

e. Based on my review of ROMANO's and CC-1's and CC-3's emails, I am aware that ROMANO and others attempted to sell the Mexican-made PPE facemasks at prices marked up between approximately 250% and 1,100%.

**The Purported Hedge Fund**
**Sourced Respirators**

f. On or about March 12, 2020, CC-2 emailed ROMANO, among others, about a separate purported opportunity to acquire up to 400 million 3M-brand respirators. CC-2's email stated, in part, that one of CC-2's entities ("CC-2 Company-2"), which had a name similar to CC-2 Company-1's name, "has secured the rights to manufacture . . . with 3M factories 3M N95 NIOSH particulate respirator Models 1860 and 8210, with a cap amount of *400 million units worldwide*." CC-2 offered per-mask prices of $5.20 and $5.50 for 3M models 8210 and 1860, respectively, on orders of at least 5 million.

g. Based on my investigation, CC-2 Company-2, which, as described below, ROMANO represented to be a "hedge fund," appears to be a fictitious entity. Also, based on my review of records obtained during the course of the investigation and my conversations with 3M's representatives, I am aware that 3M never agreed to manufacture respirators for CC-2 Company-2 and none of CC2 Company-1, CC-2 Company-2, or CC-2 was authorized to distribute 3M products or solicit purchase orders from prospective customers on behalf of 3M.

h. In the days that followed, ROMANO (with the assistance of CC-2) created a document on CC-2 Company-1's letterhead stating that Vendor-1 was authorized to sell 3M products on CC-2 Company-1's behalf (the "Fictitious Authorization Letter"). On or about March 15, 2020, ROMANO emailed CC-2 a draft of the Fictitious Authorization Letter. The body of the email stated, "Make changes if needed." The draft document that ROMANO had prepared stated:

> [CC-2 Company-1] through [CC-2 Company-2] has secured the rights to manufacture 400 million Units (Masks) with 3M factories in the US. 3M will produce the N95 NIOSH particulate respirator Models 1860 and 8210 FOB 3M factories.
>
> This letter represents that [Vendor-1] is an authorized agent to represent our products around the world, to take and accept orders, deposits, and payment through their business operations headquartered in Manalapan NJ USA.
>
> All orders are subject to inventory availability's [sic] to be confirmed by [Vendor-1]. All Purchase orders,

> deposits, payments, and or letters of credit are to be secured with [Vendor-1].
>
> [Vendor-1] will monitor each order and provide details and confirmations of manufacturing so shipping arrangements can be made for delivery. [Vendor-1] represents the pricing on each product, in USA dollars.

i. The following day, on or about March 16, 2020, CC-2 emailed ROMANO a signed copy of the Fictitious Authorization Letter on CC-2 Company-1 letterhead. CC-2's spouse signed as the "President" of CC-2 Company-1.

**ROMANO Begins Attempts To Sell 3M-Brand Respirators**

j. At or around the same time that ROMANO created the Fictitious Authorization Letter, ROMANO began in earnest his efforts to sell 3M-brand respirators to multiple buyers, even though ROMANO was not an authorized 3M distributor and ROMANO knew or had reason to know that CC-2 Company-1 and CC-2 Company-2 had no ability to procure face respirators from 3M. For example, on or about March 16, 2020, ROMANO sent an email to CC-1 stating, in substance and in part, that CC-1 could submit the Fictitious Authorization Letter to potential buyers.

k. Likewise, based on my participation in this investigation, including my review of information and records obtained from CC-3's legal representatives, I have learned that ROMANO told CC-3 in or about mid-March, in substance and in part, that ROMANO could obtain up to 400 million 3M-brand face respirators from a "hedge fund" that had purportedly preordered 400 million face respirators from 3M. Thus, on or about March 14, 2020, ROMANO sent an email to CC-3, stating in part, "Our situation has changed, our partners have secured a commitment for 400 million masks from 3M." A few days later, on or about March 17, 2020, ROMANO emailed the Fictitious Authorization Letter to CC-3, but redacted the name of CC-2 Company-2, *i.e.*, the "hedge fund" entity that purportedly had a contract with 3M to manufacture 400 million respirators. Based on my participation in this investigation, including my review of email and text correspondence between ROMANO and CC-2, I believe that ROMANO was aware that CC-2 and CC-2 Company-2 had no such contract with 3M to obtain 3M-brand face respirators. I further believe that ROMANO redacted the name of CC-2 Company-2 in an effort to conceal CC-2's association with the entity that claimed to have rights to manufacture 3M "masks" with 3M factories.

l. CC-3 told ROMANO that the Fictitious Authorization Letter was "good -- but not great. It really needs to be dated and it should have an expiration date (say 1 year)." On March 17, 2020, ROMANO emailed CC-3 a revised version of the Fictitious Authorization Letter, which had been backdated to March 2, 2020 and listed a March 2, 2021 expiration.

m. On or about March 18, 2020, CC-3 introduced ROMANO to Broker-1 and Broker-2 for the purpose of selling face respirators sourced by ROMANO. CC-3 stated in an email to Broker-1 and Broker-2 that ROMANO had "enormous contracts both with 3M and another company with a plant in Mexico" to manufacture face respirators.

n. Thereafter, Broker-1 and Broker-2 attempted to sell PPE facemasks on ROMANO's behalf. On or about March 19, 2020, Broker-1 sent an email to NYC offering to sell certain PPE facemasks on behalf of Vendor-1. In particular, Broker-1 offered, among other things, 2-layer pleated masks and 3-layer pleated masks. Based on my review of emails and text messages between Broker-1 and the City, and ROMANO and CC-2, I am aware that ROMANO and Vendor-1 attempted to sell PPE facemasks to the City at prices marked up between 390% and 1,129% from the manufacturer's prices.

o. Broker-1 also informed NYC's Office of Citywide Procurement that Vendor-1 could sell a large volume of 3M-brand face respirators, conveying to NYC several of ROMANO's materially false statements, including that Vendor-1 had a relationship with a hedge fund that had a contract with 3M to obtain 400 million face respirators and that the respirators would be manufactured in the United States. In reality, Vendor-1 had no ability or authority to procure or sell 3M-brand face respirators.

p. While Broker-1 and Broker-2 negotiated with NYC on ROMANO's behalf, CC-3 continued to express concerns about ROMANO's pricing, but ROMANO refused to adjust prices. On March 22, 2020, at approximately 5:58 p.m., ROMANO sent a text message to CC-3, stating in part, "I think we are finally at a point of desperation where institutions and governments are willing to consider our pricing." On March 25, 2020, which, as described below, was the same day that Vendor-1 submitted its initial formal quote to NYC to provide NYC with N95 respirators, CC-3 sent an email to Broker-1 that (again) expressed alarm about ROMANO's pricing: "I'm really cringing over the prices. I'm worried about allegations of price gouging especially with all the emphasis that has been placed on

this concept by the government in their communications with the citizens. . . . Although I believe you know me to be an optimist, I would be scared to send this out."

q. While CC-3 was concerned about allegations of price gouging, ROMANO appeared concerned about the Defense Production Act. Based on my review of a transcript of the White House press conference held on or about March 22, 2020, starting at approximately 5:55 p.m., I am aware that Presidential advisor Peter Navarro discussed the Defense Production Act. Navarro explained that the Act authorizes the President to regulate scarce resources, "both from the supply chain to the manufacturers, and from the manufacturers to the end users, such as the healthcare professionals." Navarro remarked that he had received "a lot of calls" about hoarding that were "very disquieting." Navarro noted that "[b]rokers are offering millions of items, whether goggles, masks, or whatever. And you go through three different brokers, tracking to a warehouse in LA that's allegedly got 10 million masks and they might charge you seven times what they cost. That's price gouging."

r. On or about March 22, 2020, starting at approximately 6:30 p.m., *i.e.*, approximately thirty-five minutes after the White House press conference began, ROMANO and CC-2 exchanged the following text messages:

| | |
|---|---|
| ROMANO: | Trump press conference not promising for us |
| CC-2: | What did they say |
| ROMANO: | Going after brokers. If your [sic] hoarding medical supplies come forward with fair price and they will pay. If not we will get you |
| CC-2: | We are not hoarding we are producing and selling as produced |
| ROMANO: | I know. So can we still produce 3m? |
| CC-2: | Waiting for contract |

**ROMANO Attempts to Acquire**
**3M Face Respirators at List Prices**

25. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. By late March, RONALD ROMANO, the defendant, still had no viable source to obtain 3M respirators. On March 24, 2020, ROMANO sent a text message to CC-2, asking if there was "[a]ny news on N95?" CC-2 responded, in part, "Only Chinese right now not confident . . . ."

b. On or about March 24 and 25, 2020, ROMANO discussed with CC-1 and CC-1's son the topic of acquiring 3M face respirators directly from 3M. Specifically, on or about March 25, 2020, ROMANO directed CC-1 to contact 3M: "see if you get a contact who can take the order." Approximately twenty minutes later, CC-1 emailed 3M, falsely stating in substance and in part, "My company [Vendor-1], has a purchase order for the n95 mask, model numbers 1860 for 5 million and model number 8210 for 2 million." This statement, which appears to refer to a purchase order from NYC, is false.[2] Vendor-1 did not have (and never obtained) a purchase order from NYC.

c. Later that day, 3M sent an automated email response to CC-1, stating, in substance and in part, that response times were delayed due to the COVID-19 crisis. CC-1 forwarded this email to ROMANO, who replied, "i'M GOING TO SUBMIT IT TO THEM," which I believe, based on my participation in this investigation and the context of this communication, to be a reference to Vendor-1's fraudulent submission of a formal quote to NYC for the sale of 3M respirators despite the fact that ROMANO and Vendor-1 had no supply or ability to obtain such respirators.

d. On or about March 24, 2020, CC-1 sent a high-priority mass email to prospective purchasers of PPE, informing them that "3m masks are no longer available." However, neither

[2] As set forth below, Vendor-1 submitted numerous formal quotes to NYC for seven million 3M face respirators: five million model 1860 respirators and two million model 8210 respirators.

ROMANO nor CC-1 (nor Broker-1 or Broker-2, who were in regular communication with NYC on Vendor-1's behalf) informed NYC that 3M face respirators were no longer available. Instead, as set forth in greater detail below, the day after CC-1 told other customers that 3M face respirators were unavailable, ROMANO caused Vendor-1 to submit to NYC the first of several formal quotes for 3M respirators.

e. On or about March 26, 2020, 3M emailed CC-1 and stated, in substance and in part, that 3M only sells its respirators to authorized distributors.

**Romano Causes the Submission of Numerous False and Misleading Formal Quotes to NYC For 3M Face Respirators**

26. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. On or about March 24, 2020, CC-3 sent a text message to RONALD ROMANO, the defendant, stating in part, "Ron! Good morning! We are very close to a 5 million order from New York City!!!!" In a subsequent text message, CC-3 asked ROMANO "urgently" to call Broker-1 and Broker-2 because "NYC wants best and final prices." ROMANO and Broker-1 then worked together to submit to NYC an IRS Form W9, which listed Vendor-1 as the seller and was signed by ROMANO.

b. On or about March 25, 2020, at approximately 10:03 a.m., NYC requested a formal quote for five million 3M-brand model 1860 face respirators and two million 3M-brand model 8210 face respirators. According to Broker-1, NYC would issue a purchase order if it agreed to the terms of the formal quote.

c. On or about March 25, 2020, at approximately 12:44 p.m., CC-3 emailed ROMANO and CC-1 a draft formal quote for their review. Approximately one hour later, ROMANO emailed CC-3 a signed copy of the formal quote (the "First Formal Quote"). At

approximately 2:07 p.m., Broker-1 emailed the First Formal Quote to NYC.[3]

d. Through the First Formal Quote, Vendor-1 stated that it would sell the respirators for $6.33 per "mask" for two million 3M 8210 respirators and for $6.65 per "mask" for five million 3M 1860 respirators, for a total of $45,910,000. As alleged herein, ROMANO attempted to source these respirators from 3M directly. 3M has not raised its prices during the COVID-19 pandemic. Thus, ROMANO attempted to sell 3M respirators to NYC at more than a 400% markup.

e. The First Formal Quote further provided that "payment in full must be made before shipping," that the 3M respirators would be manufactured in the United States, and that "acceptance of the purchase order is at the full discretion of 3M and supplies are based upon availability. The N95 masks from 3M can be produced at any of 3 plants in the USA according to their manufacturing schedule." Based on my involvement in this investigation, including my review of records and discussions with 3M representatives, I am aware that Vendor-1 was not authorized to solicit purchase orders from customers for submission to 3M for approval. Nor was Vendor-1 authorized to state how, where, or in what quantity such orders would be filled. Also, 3M does not accept purchase orders from unauthorized distributors. Through submission of the First Formal Quote (and the formal quotes that followed), ROMANO implied a relationship with 3M that does not exist. Based on my discussions with a supervisor at NYC's Office of Citywide Procurement ("City Employee-1") responsible for the potential transaction with Vendor-1, I am aware that, based on Vendor-1's submissions to NYC, City Employee-1 believed that Vendor-1 had a legitimate business relationship with 3M. City Employee-1 was also particularly interested in a potential deal with Vendor-1 because the respirators were asserted to be manufactured in the United States, which indicated a quicker delivery time.

f. After receiving the First Formal Quote, NYC responded, in substance and in part, that NYC does not issue purchase orders that provide for payment before delivery. After

---

[3] Based on my review of cell site location information from Broker-1's cellphone obtained from the cellphone's service provider pursuant to a search warrant, I am aware that Broker-1 was in the vicinity of Philadelphia, Pennsylvania when Broker-1 emailed the First Formal Quote to NYC's Office of Citywide Procurement in New York, New York.

NYC responded, CC-3 sent a text message to ROMANO, stating in part, "Could you please call [Broker-1 and Broker-2] they want to discuss . . . what they learned regarding payment terms and to strategize."

g. On or about March 26, 2020, Broker-2 emailed a revised formal quote (the "Second Formal Quote") to NYC's Office of Citywide Procurement. The payment terms were revised to state that "[p]ayment must be made upon receipt of Each shipment Net 15 days." At the same time, Broker-2 submitted Technical Specification Sheets for both models of 3M-brand N95 respirators that Vendor-1 purported to have available for sale. 3M's famous design mark appeared throughout both Technical Specifications, inferring a relationship between 3M and Vendor-1 that did not exist.

h. Between approximately March 26 and March 31, 2020, Broker-1 and Broker-2 continued to correspond with NYC on behalf of ROMANO about the sale of 3M respirators. At no time during this period did ROMANO disclose that Vendor-1 had no ability or authorization to sell 3M face respirators. During this time period—-while NYC was facing an unprecedented crisis and in desperate need of PPE for its healthcare workers and first responders—-NYC expended employee time and resources in attempting to purchase 3M respirators from Vendor-1, time and resources that could have been directed towards legitimate suppliers.

i. On or about March 30, 2020, City Employee-1 emailed Broker-1 in substance and in part, "As discussed, if you can get both masks 8210 and 1860 in the less than $6 price point, that will greatly enhance the chances that this gets approved. So if you could revise the quote with your best and final offer that will be greatly appreciated."

j. After consulting with ROMANO, on or about March 31, 2020, Broker-1 emailed NYC another revised formal quote (the "Third Formal Quote"). Through the Third Formal Quote, Vendor-1 stated that it would sell the respirators for $6.05 per "mask" for two million 3M 8210 respirators and for $6.35 per "mask" for five million 3M 1860 respirators, for a total of $43,850,000. This "best and final offer" represented an approximately 380% markup from the 3M list price.

k. Later that evening, on or about March 31, 2020, at approximately 9:29 p.m., CC-3 sent an email to ROMANO and Broker-1 stating in part, "I just heard from someone who knows well that anyone caught selling masks at or about $6.50 will face an FBI

investigation." ROMANO responded, "They should investigate who is paying it. I thought we are a free market of supply and demand? We are not the manufacturer price gauging [sic]. we are a buyer and seller marking up about 20 to 25% from OEM price with multiple costs, Not illegal or enforceable." But, as alleged herein, the manufacturer, 3M, did not raise its prices, and ROMANO attempted to mark up the prices significantly more than 25% from the list price.

**Romano Causes the Submission of False and Misleading References To NYC**

27. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. Based on my conversations with city personnel including City Employee-1, I am aware that during the COVID-19 crisis NYC suspended its usual practice of procuring goods and services only from approved vendors. Given NYC's immediate and critical need for PPE, NYC received bids and quotes from never-before-used vendors, such as Vendor-1. However, NYC required new vendors to provide references.

b. On or about March 31, 2020, at approximately 1:16 p.m., NYC sent an email to Broker-1 requesting "3 references that we may contact to verify delivery, responsiveness, etc." After receiving this email, Broker-1 notified RONALD ROMANO, the defendant, through email and text message, that NYC requested references.

c. Following NYC's request for references from Vendor-1, ROMANO engaged in discussions with others that, I believe, reflect his reluctance to submit references and efforts to deceive and make false statements to NYC:

i. On or about March 31, 2020, at approximately 6:08 p.m., ROMANO texted CC-3: "I'm not sure when we actually have to give them these references so I'm holding out for now." Approximately twenty minutes later, CC-3 sent ROMANO a voice message, stating in substance and in part, "I thought the references were the last step to getting the purchase order."

Several minutes later, CC-3 forwarded to ROMANO a text message from Broker-1, stating in part, "I need 3 references of companies that [Vendor-1] has sold masks to, as proof due to the massive fraud going on. They will not issue the PO without the references, so the sooner we receive it, the better." Approximately ten minutes later, ROMANO responded, "Ok will send later tonight."

ii. Later in the evening of on or about March 31, 2020, ROMANO and CC-3 discussed, in substance and in part, using CC-1 as a reference for Vendor-1, despite the fact that CC-1 was ROMANO's business associate and the Vice President for Global Sales at Vendor-1. On or about March 31, 2020, at approximately 8:47 p.m., ROMANO sent a text message to CC-1, stating in part, "I may need to list has [sic] a reference for NYC PO that we did business."

iii. On or about March 31, 2020, at approximately 8:47 p.m., CC-3 sent a text message to ROMANO, stating in part, "Did you see the email? NYC specifically says what questions will be asked—so you will need to prep them and agree with the answers."

iv. On or about March 31, 2020, at approximately 9:29 p.m., Broker-1 sent a text message to ROMANO and CC-3, stating in part, "Hi Ron don't forget the 3 references." Approximately one minute later, ROMANO responded, "What questions are they going to ask? Will they definitely call?" Broker-1 responded, in part, "Maybe their [sic] just want to make sure [Vendor-1] has sold to other companies." "[They need] Name of Company Contact Name Contact Number Service Provided Contract Amount." "Again their [sic] is a lot of fraud going on so their [sic] want to make sure [Vendor-1] has sold to other buyers."

v. On or about March 31, 2020, at approximately 11:37 p.m., Broker-1 sent ROMANO a text message, stating in part, "Ron are you still up to send the 3 references?"

vi. On or about March 31, 2020, at approximately 11:46 p.m., ROMANO emailed CC-3 and Broker-1 a document that listed references for Vendor-1 (the "References Document"). The References Document listed three references: (1) a Purchasing Agent for the Florida Division of Emergency Management (the "FDEM"); (2) a naturopathic medical university (the "Medical University"); and (3) CC-2 and CC-2 Company-1.

vii. The three references listed on the References Document were materially false and misleading. First, the References Document listed a $5,460,000 sale of three million facemasks to the FDEM. Based on my conversations with the Director

of the FDEM, I am aware that the individual listed on the References Document as the "Purchasing Agent" of the FDEM is not an employee, agent, or representative of FDEM; rather, that person, Broker-3, was a broker who attempted to sell respirators to the FDEM on ROMANO's behalf. Also, Vendor-1 never sold respirators to the FDEM. Rather, as set forth below, Vendor-1 attempted to sell respirators to the FDEM via Broker-3 but ultimately was unable to procure financing. Second, the References Document falsely stated that Vendor-1 had sold $123,600 worth of 5-ply surgical masks to the Medical University. ROMANO sold face coverings to the Medical University for approximately $12,000 (not $123,000), and, according to the Medical University, those face coverings appeared to be of such inferior quality that the Medical University did not distribute them.[4] Third, the References Document indicated that Vendor-1 supplied CC-2 and CC-2 Company-1 with 3-ply face respirators. Based on my participation in this investigation, including my review of text messages and email correspondence between ROMANO and CC-2, I believe this representation was false. I have seen no indication that ROMANO supplied respirators to CC-2 or CC-2 Company-1. To the contrary, ROMANO attempted to acquire respirators *from* CC-2.

---

[4] On or about March 20, 2020, the Medical University purchased 4,000 respirators from Vendor-1 to be distributed to staff and students. Based on my discussions with an employee of the Medical University involved in the purchase of the respirators from Vendor-1, I am aware that the Medical University understood the order to be for "5-ply," virus-protection respirators, pleated with elastic ear loops. On or about April 22, 2020, the Medical University appeared to have received something very different. It received the face coverings in packaging that stated, "For general everyday protection only. NOT Reusable THIS IS NOT A MEDICAL DEVICE, NOT FOR RESALE." The face coverings were not pleated and did not have elastic ear loops. Following delivery, the Medical University inquired as to the specifications of the face coverings. ROMANO emailed the Medical University a document (the "Specification Document") stating that the face coverings were "5-ply." But based on my review of ROMANO's, CC-1's, and CC-2's emails, it appears that the original version of the Specification Document indicated that the face coverings were "3-ply." Ultimately, the Medical University attempted to return the face coverings because staff did not believe they were safe for their intended use. Vendor-1 charged the Medical University approximately $12,360 for these face coverings, a markup of approximately 360%.

d. On or about April 1, 2020, at approximately 11:54 a.m., CC-3 emailed the References Document to NYC on ROMANO's behalf.

e. On or about April 1, 2020, at approximately 12:05 p.m., ROMANO emailed CC-2 a copy of the References Document, and wrote in the body of the email, "In case they call on the reference."

f. Based on my review of records obtained from NYC's Office of Citywide Procurement, I am aware that, on or about April 1, 2020, NYC personnel contacted CC-2, whom ROMANO had listed on the References Document. NYC personnel notes from that call indicate that CC-2 stated, in substance and in part, "CC-2 has worked with [Vendor-1] for numerous orders in the past for surgical masks and medical supplies. CC-2 advised that [Vendor-1] is straight forward, delivers on time and that product meets expectations." For the reasons set forth above, CC-2's statements to NYC appear to have been materially false and misleading.

**NYC's Requests for Authorized Distribution Agreement**

28. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. In response to an inquiry by NYC about Vendor-1 and RONALD ROMANO, the defendant, on or about April 1, 2020, 3M personnel advised NYC that ROMANO was not an authorized 3M distributor.

b. On or about April 1, 2020, at approximately 6:07 p.m., City Employee-1 emailed Broker-1, "We need to be able to track down the authorized distributor of these masks if we are able to move forward. I will need documentation from 3M authorizing the distribution of these masks and the connection to [Vendor-1]. All of the paper work must be above board and able to be verified." At approximately 6:44 p.m., Broker-1 forwarded this email to CC-3 and ROMANO. CC-3 responded, "Yikes."

c. Between approximately March 25 and April 2, 2020, ROMANO discussed with CC-3, among others, the possibility of

obtaining up to 100 million 3M-brand respirators from a Peru-based exporter that claimed to have obtained 100 million 3M-brand respirators from 3M in the Netherlands. ROMANO discussed, in substance and in part, selling these respirators to NYC and an associate of CC-3. Between April 1 and April 2, 2020, ROMANO sent CC-3, among other things, a "proforma invoice" purporting to reflect the sale of 100 million 3M-brand respirators from 3M in the Netherlands to a Peru-based exporter, and a contract between an entity associated with CC-2 and the Peruvian export company. The contract was for the sale of 100 million 3M model 8210 face respirators. Based on my discussions with 3M representatives, I am aware that these documents are fictitious. Among other things, the "proforma invoice" listed a non-existent 3M legal entity and incorrectly stated that the respirators would be manufactured in Uruguay when, in fact, 3M does not manufacture respirators in Uruguay.

d. On or about April 3, 2020, at approximately 9:20 p.m., ROMANO sent a redacted version of the "proforma invoice" to Broker-1 and stated, "let me know what you think."

e. At or about the same time that ROMANO asked about sending the "proforma invoice" to NYC, ROMANO was questioning the authenticity of the documents. Before sending the "proforma invoice" and contract described above, on or about March 31, 2020, CC-2 emailed ROMANO a link to a website that warned that the Peruvian exporter was a "scammer." The next day, on or about April 1, 2020, CC-2 sent ROMANO the "proforma invoice," with the subject line, "For your eyes only." In an April 4, 2020, text message to CC-2, ROMANO stated, "I haven't believed anyone. Not even our guy in Peru lol. . . . We need to verify orders."

f. As set forth above, notwithstanding ROMANO's concerns about the Peruvian exporter, on April 1 and 2, 2020, ROMANO forwarded the "proforma invoice" and contract with the Peruvian exporter to CC-3.

g. On or about April 6, 2020, CC-3, Broker-1, and Broker-2 ended their business efforts with ROMANO.

**ROMANO's Efforts to Sell PPE Facemasks to Florida**

29. In addition to ROMANO's fraudulent efforts to gouge NYC, ROMANO similarly attempted to gouge a government agency in Florida. Based on my experience and my knowledge derived from this investigation, including my participation in witness interviews,

including my conversations with the Director of the FDEM, my review of reports and records, my review of correspondence and documents obtained pursuant to judicially-authorized warrants, and my review of publicly-available documents and public reporting, I have learned the following, among other things:

a. In or about March 2020, CC-3 connected RONALD ROMANO, the defendant, with Broker-3, an attorney and broker based in Miami, for the purpose of selling PPE facemasks. Thereafter, Broker-3 attempted to sell to Florida customers PPE facemasks sourced from the same Mexico-based manufacturer referenced above.

b. On or about March 27, 2020, Broker-3 sent an email to FDEM offering to sell "5 million, 3-ply masks (specs attached) FOB Laredo, Texas.[5] Price $1.80/mask (quote attached)." The formal quote attached to this email described the facemasks as "3-ply N99 masks" and stated that the facemasks "were manufactured at a factory in Mexico City and were brought to a warehouse in Laredo, Texas on Thursday, 26 March."[6] The formal quote was on Vendor-1's letterhead and signed by ROMANO.

c. The March 27 formal quote appears to have been false insofar as it stated that the N99 facemasks were in Texas as of March 26. On or about March 28, 2020, CC-3 sent a text message to ROMANO and Broker-3 explaining, based on information that CC-3 appeared to obtain from ROMANO, that "the masks are in transit to Laredo from the factory. It is a 700 mile 13 hour trip." That the PPE be physically present in the United States was apparently important to the FDEM. In a March 28, 2020 email from CC-3 to Broker-3, CC-3 stated in part, "They were not interested or responsive to inventory not present in the US last time."

d. After several days of negotiations with the FDEM, on or about March 29, 2020, Broker-3 submitted a revised formal quote, at the direction of ROMANO, for 3 million N99 facemasks, $1.82 per mask, for a total sale price of $5,460,000. Based on my review of ROMANO's and CC-2's emails, I am aware that ROMANO and CC-2 were able to obtain these facemasks from their source-of-

---

[5] Broker-3 also sent this email to CC-3, who resided in New York, New York.

[6] Based on my review of HHS's Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19, which was published in the Federal Register on or about March 25, 2020, I am aware that N99 facemasks were designated as "Scarce Materials" under the Defense Production Act.

supply, the Mexico-based manufacturer, for approximately 28 cents per mask. Thus, ROMANO attempted to sell these three million N99 facemasks at an approximately 500% markup.

e. On or about March 30, 2020, the FDEM issued a purchase order for three million 3-ply N99 facemasks for $5,460,000. ROMANO and Vendor-1 were unable to deliver these facemasks, however, because they could not arrange for financing. Nevertheless, as noted above, ROMANO listed the failed FDEM transaction among the fraudulent references submitted to NYC.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of RONALD ROMANO, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

s/Deleassa Penland by KNF, USMJ
DELEASSA PENLAND
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this 21 day of May, 2020

Kevin Nathaniel Fox

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK